No. 23-1534

# In the United States Court of Appeals
## FOR THE SEVENTH CIRCUIT

———————

PARENTS PROTECTING OUR CHILDREN, UA,
PLAINTIFF-APPELLANT,

*v.*

EAU CLAIRE AREA SCHOOL DISTRICT, WISCONSIN, TIM NORDIN,
LORI BICA, MARQUELL JOHNSON, PHIL LYONS, JOSHUA CLEMENTS,
STEPHANIE FARRAR, ERICA ZERR, and MICHAEL JOHNSON,
DEFENDANTS-APPELLEES.

———————

On Appeal from the United States District Court
for the Western District of Wisconsin, Case No. 3:22-CV-508
the Honorable Stephen L. Crocker, Magistrate Judge

———————

**BRIEF AND REQUIRED SHORT APPENDIX OF APPELLANT
PARENTS PROTECTING OUR CHILDREN, UA**

———————

WISCONSIN INSTITUTE FOR
LAW & LIBERTY, INC.

RICHARD M. ESENBERG
LUKE N. BERG
*Counsel of Record*

330 E. Kilbourn Ave., Ste. 725
Milwaukee, WI 53202
Phone: (414) 727-9455
Fax: (414) 727-6385

AMERICA FIRST LEGAL FOUNDATION

NICHOLAS R. BARRY
REED D. RUBINSTEIN

300 Independence Ave SE
Washington, DC 20003
Phone: (202) 964-3721

*Attorneys for Plaintiff-Appellant*

**Oral Argument Requested**

## RULE 26.1 DISCLOSURE STATEMENT

1. The full name of every party that the attorney represents in the case.

   Parents Protecting Our Children, UA

2. The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   Wisconsin Institute for Law & Liberty, Inc.
   America First Legal Foundation

3. If the party or amicus is a corporation:

   (i) Identify all its parent corporations, if any; and

      None

   (ii) List any publicly held company that owns 10% or more of the party's or amicus' stock:

      None

# TABLE OF CONTENTS

RULE 26.1 DISCLOSURE STATEMENT ........................................................ i

JURISDICTIONAL STATEMENT ................................................................ 1

STATEMENT OF ISSUES ............................................................................ 1

INTRODUCTION ........................................................................................ 2

STATEMENT OF THE CASE ...................................................................... 3

    A.  Background on Plaintiff's Claims and Parents' Constitutionally Protected Decision-Making Role ................................................... 3

    B.  Background on Gender Identity Transitions During Childhood ............ 6

    C.  The District's Policy and Training ........................................... 11

    D.  Background on Plaintiff's Members ......................................... 16

    E.  Procedural History .............................................................. 18

SUMMARY OF ARGUMENT ...................................................................... 19

STANDARD OF REVIEW .......................................................................... 20

ARGUMENT .............................................................................................. 21

    I.  The District's Policy Presently Injures Plaintiff's Members ................ 21

        A.  The Policy Transfers Parents' Decision-Making Authority from Them to the School and/or Minor Students ............................ 21

        B.  The Supreme Court Has Recognized That Parents Have Standing to Challenge School Policies. .................................... 26

        C.  The District's Policy Denies Plaintiff's Members' Access to Information to Which They Are Entitled ................................. 28

        D.  The Policy Presently Harms Parent-Child Relationships .............. 32

    II.  Plaintiff's Members Have Standing to Prevent Future Injuries .......... 33

        A.  The District's Policy Creates a Substantial Risk of Harm to Plaintiff's Members and to Their Children ............................... 33

        B.  Plaintiff Can Bring a Pre-enforcement Challenge ...................... 40

CONCLUSION .......................................................................................... 42

# TABLE OF AUTHORITIES

**Cases**

*Alfonso v. Fernandez,*
  195 A.D.2d 46, 606 N.Y.S.2d 259 (1993)................................................22

*Am. C.L. Union of Illinois v. Alvarez,*
  679 F.3d 583 (7th Cir. 2012)....................................................................40

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n,*
  576 U.S. 787 (2015)............................................................................22, 23

*Bellotti v. Baird,*
  443 U.S. 622 (1979)....................................................................................5

*Bovee v. Broom,*
  732 F.3d 743 (7th Cir. 2013).....................................................................1

*Brokaw v. Mercer Cnty.,*
  235 F.3d 1000 (7th Cir. 2000).............................................................6, 32

*C.N. v. Ridgewood Bd. of Educ.,*
  430 F.3d 159 (3d Cir. 2005) ......................................................................5

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013)............................................................................33, 39

*Deanda v. Becerra,*
  No. 2:20-CV-092-Z, 2022 WL 17572093 (N.D. Tex. Dec. 8, 2022).........24

*Doe 1 v. Madison Metro. Sch. Dist.,*
  2022 WI 65, 403 Wis. 2d 369, 976 N.W.2d 584.....................................25

*Doe v. Heck,*
  327 F.3d 492 (7th Cir. 2003)......................................................................6

*FEC v. Cruz,*
  142 S. Ct. 1638 (2022)..............................................................................40

*Fed. Election Comm'n v. Akins,*
  524 U.S. 11 (1998)....................................................................................28

*Gruenke v. Seip,*
  225 F.3d 290 (3d Cir. 2000) ...............................................................28, 29

*In re Sheila W.,*
  2013 WI 63, 348 Wis. 2d 674, 835 N.W.2d 148......................................24

*Jackson v. City and County of San Francisco,*
  746 F.3d 953 (9th Cir. 2014).....................................................................29

*Jordan by Jordan v. Jackson,*
  15 F.3d 333 (4th Cir. 1994)..................................................................6, 32

*Korte v. Sebelius,*
    735 F.3d 654 (7th Cir. 2013)....................................................35

*Kosilek v. Spencer,*
    774 F.3d 63 (1st Cir. 2014) ......................................................8

*Lee v. City of Chicago,*
    330 F.3d 456 (7th Cir. 2003)......................................................3

*MedImmune, Inc. v. Genentech, Inc.,*
    549 U.S. 118 (2007).........................................................36, 40

*Milwaukee Police Ass'n v. Flynn,*
    863 F.3d 636 (7th Cir. 2017)....................................................21

*Parents Involved in Comty. Schs. v. Seattle Sch. Dist. No. 1,*
    551 U.S. 701 (2007).....................................................19, 26, 27

*Parents United for Better Sch., Inc. v. Sch. Dist. of Philadelphia Bd. of*
    *Educ.*, 166 Pa. Cmwlth. 462, 646 A.2d 689 (1994) ...............................24

*Parham v. J. R.,*
    442 U.S. 584 (1979)................................................ 4, 5, 22, 29

*Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati,*
    822 F.2d 1390 (6th Cir. 1987)....................................................40

*Public Citizen v. U.S. Dep't of Just.,*
    491 U.S. 440 (1989)..............................................................28

*Quilloin v. Walcott,*
    434 U.S. 246 (1978)...........................................................6, 32

*Remijas v. Neiman Marcus Grp., LLC,*
    794 F.3d 688 (7th Cir. 2015)......................................3, 20, 33, 37

*Ricard v. USD 475 Geary Cnty., KS Sch. Bd.,*
    No. 5:22-CV-4015, 2022 WL 1471372 (D. Kan. May 9, 2022) ...............22

*Skinner v. Oklahoma,*
    316 U.S. 535 (1942)................................................................4

*Spokeo v. Robins,*
    578 U.S. 330 (2016)..............................................................28

*Stanley v. Illinois,*
    405 U.S. 645 (1972)...........................................................6, 21

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014).....................................................33, 40, 41

*TransUnion LLC v. Ramirez,*
    141 S. Ct. 2190 (2021)......................................................passim

iv

*Troxel v. Granville,*
　　530 U.S. 57 (2000) ........................................................................ passim

*Vitolo v. Guzman,*
　　999 F.3d 353 (6th Cir. 2021) ................................................................ 35

*Warth v. Seldin,*
　　422 U.S. 490 (1975) ............................................................................. 21

*Wisconsin Right To Life, Inc. v. Barland,*
　　751 F.3d 804 (7th Cir. 2014) ................................................................ 35

*Wisconsin v. Yoder,*
　　406 U.S. 205 (1972) .......................................................................... 4, 5

*Zorach v. Clauson,*
　　343 U.S. 306 (1952) ............................................................................. 27

**Statutes**

20 U.S.C. § 1232g ......................................................................................... 13

20 U.S.C. § 1232h .............................................................................. 1, 19, 30

28 U.S.C. § 1331 .............................................................................................. 1

28 U.S.C. § 1343 .............................................................................................. 1

28 U.S.C. § 1367 .............................................................................................. 1

42 U.S.C. § 1983 .............................................................................................. 1

Wis. Stat. § 118.125 ....................................................................................... 13

**Other Authorities**

11A Wright & Miller, *Fed. Prac. & Proc.* § 2948.1 (3d. ed. 2022) .................... 35

*Britain changes tack in its treatment of trans-identifying children*, The
　　Economist (Nov. 17, 2022) ..................................................................... 9

Dr. Hilary Cass, *Independent review of gender identity services for
　　children and young people: Interim report* (February 2022) ................... 9

Expert Submission of Dr. Stephen B. Levine, M.D. (Mar. 12, 2020),
　　https://www.legis.state.pa.us/WU01/LI/TR/Transcripts/2020_004
　　6_0001_TSTMNY.pdf ............................................................................. 8

*Independent review into gender identity services for children and young
　　people*, NHS England,
　　https://www.england.nhs.uk/commissioning/spec-services/npc-
　　crg/gender-dysphoria-clinical-programme/gender-
　　dysphoria/independent-review-into-gender-identity-services-for-
　　children-and-young-people/ .................................................................... 8

Jesse Singal, *How the Fight Over Transgender Kids Got a Leading Sex Researcher Fired*, The Cut (Feb. 7, 2016) ..................................7

## Federal Regulations

34 CFR § 98.4 ............................................................................31

34 CFR § 98.4 ......................................................................30, 31

34 CFR § 99.20 ..........................................................................13

34 CFR § 99.3 ............................................................................13

34 CFR § 99.4 ............................................................................13

## Constitutional Provisions

Wisconsin Constitution art. I ......................................................1

Wisconsin Constitution art. X....................................................41

## Rules

Fed. R. Civ. P. 12(b)(1) ..............................................................3

## JURISDICTIONAL STATEMENT

Plaintiff filed this case on September 7, 2022. SA 1–26. The case was assigned to Magistrate Stephen L. Crocker, and all parties consented to proceed before him: Plaintiff on September 19, 2022, Dkt. 13-1, and Defendants on November 15, 2022, Dkt. 13-2. The District Court issued an order referring the case on November 18, 2022. Dkt. 13.

Because this case raises claims under the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and 20 U.S.C. § 1232h, the District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. This case also raises state law claims under Article I, §§ 1 and 18 of the Wisconsin Constitution, over which the District Court had supplemental jurisdiction under 28 U.S.C. § 1367.

Defendants filed a motion to dismiss, Dkt. 11, which the District Court granted in part, finding that Plaintiff lacked standing. The District Court entered an opinion and order, RSA 1–20, on February 21, 2023, and a judgment, RSA 21, on February 22, 2023, dismissing the case without prejudice for lack of subject matter jurisdiction, which is a final judgment for purposes of appeal. *Bovee v. Broom*, 732 F.3d 743, 743 (7th Cir. 2013). Plaintiff timely filed a notice of appeal on March 21, 2023. SA 41–42.

## STATEMENT OF ISSUES

1. Whether an association of parents with children in the Eau Claire Area School District has standing to challenge a District policy that facially violates their constitutional rights to make decisions on behalf of their own minor children and further requires District staff to hide those violations from parents?

## INTRODUCTION

Nominally, this case is about standing. But at its core, this case is about parents' right to raise their own children and whether decision-making authority resides first with the parents or with the State. The Eau Claire Area School District (the "District") has adopted a policy allowing minor children *of any age* to change their gender identity at school (name, pronouns, and intimate facility use) without parental notice or consent. The District prohibits teachers and staff from disclosing or discussing gender transitions with parents if a child asks for secrecy. Indeed, the District has brazenly trained its teachers and staff that "parents are not entitled to know their kids' identities," but must "earn" that knowledge. SA 8 ¶36; SA 38. Yet a gender identity transition during childhood is a profound and life-changing decision that can do substantial harm to a child who is confused about his or her identity, and parents must ultimately make the decision about whether a transition is in their child's best interests. SA 11–15 ¶¶49–71.

Plaintiff is an association of parents with children in the District. Plaintiff filed a facial challenge to the District's Policy to protect its members' constitutional right to raise their own children and to protect them and their children from harm. The District Court, however, erroneously held that Plaintiff lacks standing because it does not allege that the District has yet applied its Policy to secretly facilitate a transition of a member's child. That is irrelevant, for many reasons.

First, because the District allows secrecy, parents *cannot* know whether it has transitioned their child at school until *after* the process has begun and harm has been

done—that is one of the main points of this lawsuit. Second, the District has already violated parents' constitutional rights and harmed them by transferring their historically and constitutionally protected authority to direct the upbringing of their children to the District's staff; by denying them information to which they are entitled; and by unlawfully interfering with parent-child relationships. Third, the Supreme Court has recognized that parents can challenge a generally applicable school policy even though it is unknowable in advance which children will be affected. Fourth, the District's policy creates a substantial risk of multiple different kinds of injuries, including life-long harm to the members' minor children. SA 11–15. Finally, even if the District has not yet exercised its self-arrogated power to secretly transition a member's child, Plaintiff has pled a valid pre-enforcement challenge. Accordingly, this Court should reverse the decision below.

## STATEMENT OF THE CASE

### A.    Background on Plaintiff's Claims and Parents' Constitutionally Protected Decision-Making Role

Because the District Court dismissed this case on standing without prejudice under Rule 12(b)(1), and because Defendants did not cross-appeal, the merits are not before this Court. *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 697 (7th Cir. 2015); *Lee v. City of Chicago*, 330 F.3d 456, 471 (7th Cir. 2003). Nevertheless, to understand Plaintiff's standing, it is important to understand the heart of Plaintiff's claims in this case.

3

Parents have a fundamental liberty interest and constitutionally protected right under the First[1] and Fourteenth Amendments[2] "to direct the upbringing and education of children under their control." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.) (quoting *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35 (1925)). This is "perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court," *Troxel*, 530 U.S. at 65 (plurality op.), and is "established beyond debate as an enduring American tradition," *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972). Indeed, it is a basic civil right, *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942), and far more precious than mere property rights, *May v. Anderson*, 345 U.S. 528, 533 (1953). A child is not merely a creature of the State. *Pierce,* 268 U.S. at 535.

The Supreme Court has repeatedly defined this right in terms of parents' decision-making authority over their minor children. *Parham v. J. R.*, 442 U.S. 584, 602 (1979) ("Our jurisprudence historically has reflected … broad parental authority over minor children."); *Troxel*, 530 U.S. at 72–73 (plurality op.) (recognizing "the fundamental right of parents to make child rearing decisions"). Parental decision-making authority rests on two core presumptions: "that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's

---

[1] The First Amendment (made applicable to the States through the Fourteenth Amendment) protects parental decision-making authority over decisions that implicate religious beliefs. *E.g.*, *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972).

[2] Plaintiff also raises claims under two sections of the Wisconsin Constitution that provide analogous protection of parental rights. SA 20–23, ¶¶ 100–117.

difficult decisions," and that "natural bonds of affection lead parents to act in the best interests of their children." *Parham*, 442 U.S. at 602; *Yoder*, 406 U.S. at 232.

A parent has the right to say no to protect their child; the fact that a child may disagree with her parents' decision "does not diminish the parents' authority to decide what is best for the child," nor does it "transfer the power to make that decision from the parents to some agency or officer of the state." *Parham*, 442 U.S. at 603–04. As long as a parent is fit, "there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Troxel*, 530 U.S. at 68–69 (plurality op.).

Parental rights reach their peak on "matters of the greatest importance." *See C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 184 (3d Cir. 2005). One such area traditionally reserved for parents is medical care: "Most children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment. Parents can and must make those judgments." *Parham*, 442 U.S. at 603. Another category of decisions at "the heart of parental decision-making authority" are those "rais[ing] profound moral and religious concerns." *See Bellotti v. Baird*, 443 U.S. 622, 640 (1979); *C.N.*, 430 F.3d at 184. In *Yoder,* for example, the Supreme Court emphasized that the parental role is especially important "when the interests of parenthood are combined with a free exercise claim." *Yoder*, 406 U.S. at 233.

5

The Constitution also protects the parent-child relationship. The Court has "recognized on numerous occasions that the relationship between parent and child is constitutionally protected." *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) (citations omitted); *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1019 (7th Cir. 2000) ("[T]he Fourteenth Amendment prohibits the government from interfering in the familial relationship unless the government adheres to the requirements of procedural and substantive due process."); *see also Jordan by Jordan v. Jackson*, 15 F.3d 333, 342–343 (4th Cir. 1994) ("The bonds between parent and child are, in a word, sacrosanct, and the relationship between parent and child inviolable except for the most compelling reasons.").

The state may only override parents' rights if it provides both procedural due process, *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *May*, 345 U.S. at 533, and a sufficiently high substantive standard (such as "clear and convincing evidence" of abuse or harm) that respects the "traditional presumption that a fit parent will act in the best interest of his or her child." *Troxel*, 530 U.S. at 69–70. Indeed, this Court has recognized a violation of parental rights when state actors "not only failed to presume that the plaintiff parents would act in the best interest of their children, they assumed the exact opposite." *Doe v. Heck*, 327 F.3d 492, 521 (7th Cir. 2003).

## B.    Background on Gender Identity Transitions During Childhood

Socially transitioning (changing name and pronouns) to a different "gender identity" during childhood is a momentous matter, with long-term implications. SA 11–13 ¶¶51–56. Thus, when a child requests to change gender identity, there is a

major a fork in the road, a decision to be made about whether a transition will be in the child's best interests. Many experts recommend *against* an immediate transition and "affirmation" by adults, and instead believe that the appropriate initial response is to help children who express a desire to change gender identity to first process and understand what they are feeling and why. SA 11 ¶51.

Multiple studies have shown that the vast majority of children who struggle with their gender identity or experience gender dysphoria ultimately find comfort with their biological sex. SA 11, 13 ¶¶50, 56. In light of that evidence, and for other reasons, many experts believe that facilitating a transition and treating a child as if he or she is the opposite sex by using a different name and pronouns can do long-term harm to the child by reinforcing a false belief, causing that belief to set in and reducing the likelihood that the child will find comfort with his or her body. SA 12–13 ¶52. Because the District Court dismissed the complaint, this Court must accept those allegations as true. But a few examples referenced briefly in the complaint reinforce the point:

Dr. Kenneth Zucker, who for decades led "one of the most well-known clinics in the world for children and adolescents with gender dysphoria,"[3] has argued

---

[3] Singal, Jesse, *How the Fight Over Transgender Kids Got a Leading Sex Researcher Fired*, The Cut (Feb. 7, 2016), https://www.thecut.com/2016/02/fight-over-trans-kids-got-a-researcher-fired.html

publicly that "parents who support, implement, or encourage a gender social transition (and clinicians who recommend one) are implementing a psychosocial treatment that will increase the odds of long-term persistence." SA 12–13 ¶52.

Dr. Stephen Levine (cited in SA 11–12 ¶51), another well-known practitioner in the field,[4] in public testimony to a committee of the Pennsylvania Legislature, explains that, in his view, "therapy for young children that encourages transition cannot be considered to be neutral, but instead is an experimental procedure that has a high likelihood of changing the life path of the child, with highly unpredictable effects on mental and physical health, suicidality, and life expectancy."[5]

The U.K.'s National Health Service is currently reconsidering its model of transgender care (SA 11 ¶51),[6] and the doctor in charge of the review, Dr. Hilary

---

[4] Dr. Levine served as the chairman of the Standards of Care Committee that developed the 5th version of the WPATH (World Professional Association for Transgender Health) guidelines, and he was the *court-appointed* expert in the first major case in the country to reach a federal court of appeals about surgery for transgender prisoners. *Kosilek v. Spencer*, 774 F.3d 63, 77 (1st Cir. 2014).

[5] Expert Submission of Dr. Stephen B. Levine, M.D. (Mar. 12, 2020), https://www.legis.state.pa.us/WU01/LI/TR/Transcripts/2020_0046_0001_TSTMNY.pdf (linked from https://www.legis.state.pa.us/cfdocs/legis/CMS/ArchiveDetails.cfm?SessYear=2019&MeetingId=807&Code=55&Chamber=H).

[6] *See Independent review into gender identity services for children and young people*, NHS England, https://www.england.nhs.uk/commissioning/spec-services/npc-crg/gender-dysphoria-clinical-programme/gender-dysphoria/independent-review-into-gender-identity-services-for-children-and-young-people/./.

Cass, wrote in her interim report: "[I]t is important to view [social transition] as *an active intervention* because it may have significant effects on the child or young person in terms of their psychological functioning. There are different views on the benefits versus the harms of early social transition. Whatever position one takes, it is important to acknowledge that *it is not a neutral act*, and better information is needed about outcomes."[7] Based on her report, "Britain now appears to be changing tack," moving away from the "affirmative approach" and the "hurry to affirm gender identity," instead recognizing that "gender incongruence ... may be a transient phase" for young people.[8]

Even the World Professional Association for Transgender Health (WPATH), a transgender advocacy organization that strongly endorses transitioning—and which Plaintiff by no means endorses—acknowledges that "[s]ocial transitions in early childhood" are "a controversial issue," that "health professionals" have "divergent views," and therefore recommends that health professionals defer to *parents* "as they work through the options and implications," even if they ultimately "do not allow their young child to make a gender-role transition." SA 13–14 ¶¶53, 57.

---

[7] Cass, H., *Independent review of gender identity services for children and young people: Interim report* (February 2022), https://cass.independent-review.uk/publications/interim-report/./.

[8] *Britain changes tack in its treatment of trans-identifying children*, The Economist (Nov. 17, 2022), https://www.economist.com/britain/2022/11/17/britain-changes-tack-in-its-treatment-of-trans-identifying-children.

Given how recent of a phenomenon this is, there is no good evidence at this point about the long-term implications of a transition during childhood. SA 14 ¶62. WPATH even acknowledges the point: "[t]he current evidence base is insufficient to predict the long-term outcomes of completing a gender role transition during early childhood." SA 13 ¶54. Thus, treating children as if they are the opposite sex functions as a psychosocial experiment on children. SA 14 ¶63. And social transition is also a form of psychosocial medical/psychological treatment. SA 15 ¶64. Again, even WPATH, which supports childhood gender transitions, characterizes it that way. SA 13 ¶55.

Parental involvement is critical not only to make the decision about whether a transition will be in their child's best interests, but also to obtain a professional evaluation and provide support for a child struggling with gender incongruence. Gender dysphoria can be a serious mental health condition that requires professional help, SA 15 ¶67, and children dealing with gender dysphoria or questioning their gender identity often present with other comorbidities, including depression, anxiety, and suicidal thoughts, and may urgently need professional support, SA 15 ¶68. A child's desire to socially transition, to change name and pronouns, is a well-recognized indicator that the child may be dealing with gender dysphoria and should be professionally evaluated, SA 15 ¶69, yet school staff have no expertise whatsoever in diagnosing or treating gender dysphoria, nor do they have lawful authority to make treatment decisions for minor students in their care during the day. SA 15 ¶¶70–71. Under our Constitution, that authority belongs to parents, not school staff.

### C.     The District's Policy and Training

Notwithstanding parents' decision-making authority and the seriousness of adults treating children as if they are the opposite sex, the Eau Claire Area School District's Policy challenged in this case allows children to change their "gender identity" at school, including  name, pronouns, and intimate facility use, without notice to their parents or their consent. The Policy defines "transgender" students as any who "assert[ ] a gender identity or gender expression at school … that is different from the gender assigned at birth." SA 27. It allows children to select any "name and pronouns desired by the student," SA 28, and requires all teachers and staff to "respect the right of [an unemancipated minor child] to be addressed by a name and pronouns that corresponds to [his or her asserted] gender identity," without parental notification or consent. *Id*. The District further requires that "[a]ccess [to restrooms and locker rooms] should be allowed based on the *gender identity* … expressed by the student." *Id.* (emphasis in original).

None of this requires parental notice or consent under the Policy. SA 7 ¶31; SA 27–32. Indeed, the Policy provides that "[s]ome transgender, non-binary, and/or gender-nonconforming students are not 'open' at home for reasons that may include safety concerns or lack of acceptance," and on that basis directs staff to "speak with the student first before discussing a student's gender nonconformity or transgender status with the student's parent/guardian." SA 7 ¶32; SA 28. The Policy also emphasizes that "[p]rotecting the privacy of transgender, non-binary, and/or gender

non-conforming students … must be a top priority for … all staff" and that "[a]ll student … information shall be kept strictly confidential." SA 29.

When a child wants to change his or her name and pronouns at school or begin using intimate facilities reserved for the opposite sex, the District's Policy sets forth a process whereby school staff will meet with the child "to develop a specific Student Gender Support Plan," covering how the child will be addressed at school, what restrooms and locker rooms the child will use, and even where the child will sleep on overnight trips. SA 27–29 (describing the process); SA 33–36 (the "Gender Support Plan" form). Two of the questions on the form are whether the parents/guardians are "aware of their child's gender status" and their child's "requests at school," proving that the District has claimed for itself and its staff the ultimate authority to make these critical decisions without parental notice or consent.

The top of the form indicates that the only criteria for excluding parents from this process is a "student stat[ing] [that] they do not want [their] parents to know." SA 33. In other words, if a child wants to keep their gender transition at school secret from their parents, the District will happily oblige, effectively treating school like Las Vegas—what happens at school stays at school. If it were not clear enough from the text of the Policy, the District has confirmed in its briefing below that this is how its Policy works. Dkt. 12:3 ("Parent inclusion in these discussions [about a Gender Support Plan] is encouraged *unless the student explicitly tells staff not to do so*.") (emphasis added); Dkt. 12:17 ("[T]he Guidance [Policy] … encourag[es] parental involvement *unless directed not to do so by the student*.") (emphasis added).

The Gender Support Plan form further provides that "[i]f parents are not involved in creating this plan," staff must warn students that, because it is a student record, it "will be released to their parents when they request it." SA 33. (Consistent with parents' rights, both state and federal law give parents access to all of their children's education records. Wis. Stat. § 118.125(2)(a), (b); 20 U.S.C. § 1232g(a)(1)(A).) A Gender Support Plan is not required, however, for students to change their name and pronouns or begin using opposite-sex facilities,[9] so this warning appears designed to allow students who "do not want [their] parents to know" to ask that the form not be filled out, to prevent parents from learning what is happening at school. SA 33. Even when a Plan is created, the Policy allows staff to secretly meet with students, initiate a Gender Support Plan, and begin implementing a social transition at school, all without notifying parents or obtaining their consent.

Notably, the District *does* require parental consent to change a child's name in the District's *official* records. SA 30 (Part IV.b of the Policy). That is because federal FERPA regulations require *parents* (or students over 18) to request changes to education records—again, consistent with parental rights. 34 CFR §§ 99.20(a); 99.3 (definition of "eligible student"), *see also id.* § 99.4 ("rights of parents"). But the Policy emphasizes, in italics, that "*the student need not change their official records*" to change name and pronouns at school. SA 7 ¶33; SA 28. And the District will even

---

[9] The Policy states, twice in one sentence, that a plan should be developed only "when appropriate." SA 27. And, as outlined above, separate sections of the Policy give students the "right" to change their name and pronouns and use opposite-sex facilities at school and do not make a "Gender Support Plan" a prerequisite.

change "no[n] legal documents," like "Student ID cards," without parental notice or consent. SA 29.

In all other circumstances, the District recognizes that children cannot consent to medical treatment at school. Board Policy 453.4,[10] entitled "Administration of Medication to Students," mandates prior written parental consent before medication may be provided to children by school staff. In other words, the District claims for itself and its staff the power and discretion to secretly conduct a child's gender transition, a powerful form of psychosocial medical/psychological treatment, SA 13, 15 ¶¶55, 64, but recognizes it cannot provide that same child with a dose of ibuprofen or Benadryl without prior parental notice and written consent.

The District has conducted training sessions for its teachers on the Policy, and in one of those training sessions, entitled "Safe Spaces," the facilitator is directed to emphasize that "parents are not entitled to know their kids' identities," but must "earn" that knowledge:

**Slide 56– Talk amongst yourselves!**
Facilitators, guide this discussion. Remember, parents are not entitled to know their kids' identities. That knowledge must be earned. Teachers are often straddling this complex situation.  In ECASD, our priority is supporting the student.

SA 8 ¶36; SA 38.

The same training is also overtly antagonistic toward religious parents. The facilitator's notes remind the facilitator that while parents' objections (to their own

---

[10] Available at http://go.boarddocs.com/wi/ecasd/Board.nsf/goto?open&id=AXGUSS726D7F

child transitioning at school) will most likely come from religious parents, not all religion is the problem. Instead, the problem is the "weaponization of religion against queer people"—that is, parents who, based in part on their core religious beliefs, would not immediately affirm that their child is really the opposite sex.

During the online training session entitled "Safe Spaces Part Two," Christopher Jorgenson states: "We understand and acknowledge that teachers are often put in terrible positions caught between parents and their students. But much like we wouldn't act as stand-ins for abuse in other circumstances, we cannot let parents' rejection of their children guide teachers' reactions and actions and advocacy for our students." SA 8–9 ¶38. He continues reading from the slide which states: "Religion is not the problem. Discrimination is the problem. Bigotry as ideology is the problem. The weaponization of religious beliefs against marginalized people is the problem." *Id*. This same training states: "We handle religious objections too often with kid gloves …" and if parents have a "faith-based rejection of their student's queer identity" then staff "must not act as stand-ins for oppressive ideas/behaviors/attitudes, even and especially if that oppression is coming from parents." SA 9 ¶39. The training teaches that religious parents who are not affirming of their child's social transition or requested gender identity are "oppressive" and not supportive of their own children. SA 9 ¶40.

Teachers in the District have taken the District's Policy and training to heart. One teacher at North High School posted a flyer stating, "if your parents aren't accepting of your identity, I'm your mom now." SA 10–11 ¶48:

15




### D.    Background on Plaintiff's Members

Plaintiff is an unincorporated association of parents, all of whom have children in the Eau Claire Area School District. SA 3 ¶6. All of Plaintiff's members are directly injured by the Policy, in multiple ways. Because the Policy, on its face, allows the District to provide psychosocial medical/psychological treatment at school, by secretly facilitating gender transitions, without parental notice and consent, the Policy prevents parents from knowing if the school has already applied this Policy to their children or when it applies this Policy to their children in the future. SA 16–17 ¶¶75–76, 82. As a result, the Policy denies each of Plaintiff's members their rights to make health-related decisions for their child, specifically to decide whether a transition is in their child's best interests. SA 17 ¶83. It also prevents them from seeking and providing professional assistance for their children if they are dealing with gender

16

identity issues. *Id.* at ¶84. And the Policy directly interferes with the parent/child relationship by facilitating a secret double life at school, kept hidden from the parents. *Id.* at ¶83.

Most of Plaintiff's members also have sincerely held religious beliefs that there are only two sexes, that their children were born either male or female, and that sex is immutable and a gift from God. SA 18 ¶¶90–91. As a direct result of these beliefs, these parents would not immediately "affirm" whatever beliefs their children might have about their gender, but would instead remind them that they were "fearfully and wonderfully made," *see* Psalm 139:14, and seek to help them identify and address the underlying causes of their discomfort with their body and learn to accept and embrace their God-given sex. SA 19 ¶92. While they would never stop loving their children no matter what their children might believe about their gender, these parents would select a treatment approach that is consistent with their beliefs and does not involve a social transition. SA 19 ¶¶93, 96. The District's Policy directly interferes with their right to make that decision. *Id.* at ¶96. Moreover, by excluding them from the Gender Support Planning process, the District's Policy prevents them from counseling and guiding their children in accordance with their religious beliefs in the moment of decision, SA 19–20 ¶97. As outlined above, the District's Policy, and its training on that Policy, specifically targets religious parents, like Plaintiff's members, who would not consent to socially transition their children to an opposite-sex identity. *Supra* Background Part C.

17

Plaintiff's members cannot know, in advance, if or when their children will begin to wrestle with their gender identity, experience discomfort with their biological sex, or experience gender dysphoria. SA 14 ¶58. And the first indications that their child is dealing with gender identity issues or gender dysphoria may arise at school, unbeknownst to them as parents. *Id.* at ¶59. Thus, if the District follows its Policy and begins treating one of Plaintiff's members' children as the opposite sex at school, without parental notice or consent, the District may do long-term damage to their child before the parents even become aware that harm has been done. *Id.* at ¶61.

### E.     Procedural History

Plaintiff filed this case on September 7, 2022. SA 1–26. Defendants filed a motion to dismiss, Dkt. 11, which the District Court granted in part, concluding that Plaintiff lacked standing (the Court did not reach Defendants' 12(b)(6) arguments on the merits). RSA 1–20. Throughout its opinion, the Court relied heavily on its view that the injury was too speculative because Plaintiff's complaint does not allege that the District has secretly transitioned any of Plaintiff's members' children. As explained below, this is irrelevant for multiple reasons, including that Plaintiff's members *would not know* what the District is concealing from them due to the Policy allowing secrecy from parents—which is one of the main points of this lawsuit. SA 14, 16–17 ¶¶58–60, 75, 82. Plaintiff appealed, and Defendants did not cross-appeal.

## SUMMARY OF ARGUMENT

I. The District's Policy presently injures Plaintiff's members in multiple ways.

A. First, the Policy has transferred the member parents' constitutionally protected decision-making authority over the upbringing of their own children to school bureaucrats and staff with respect to one, and only one, very serious and controversial health-related decision. This is sufficient injury for Article III standing.

B.     The United States Supreme Court has held, in a case analogous to this one, that parents have standing to challenge a school district policy, to which they and their children are subjected, that facially violates constitutional rights, even though the Policy will only be applied to some children and not others. *Parents Involved in Comty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 718–720 (2007).

C.     The District denies the member-parents access to information about their own children, access that is protected by the Constitution and the Protection of Pupil Rights Amendment (or "PPRA"), 20 U.S.C. § 1232h, and its implementing regulations. This is a present injury because parents cannot know whether the District is withholding information from them or not.

D.     The very existence of the District's Policy, and its implementation, which invites students to live a double life at school and to keep this a secret from their parents with the District's help, presently interferes with parent-child relationships.

II.     The Plaintiff's members also face a substantial risk of harm.

19

A.     The District's Policy creates a "substantial risk" of numerous harms to Plaintiff's members and their children, including: violating their constitutional rights as parents; causing long-term psychological harm to their children; preventing parents from obtaining urgently needed professional care for their children; and usurping their right to say no to a transition and choose a different treatment approach. These harms are imminent at all times because the District will hide these harms from parents when they are occurring. And the risk is magnified for Plaintiff's members since they are the very kinds of parents the District has targeted as those it would exclude: parents who would not immediately affirm whatever beliefs their child might have about gender identity.

B.     Plaintiff also has standing to bring a pre-enforcement challenge to the District's Policy. The Policy punishes parents who would not agree to a transition by hiding the decision from them. And Plaintiff's members face a credible threat that the District will apply the Policy to them precisely because they would not agree to a transition. The question presented—whether school districts may exclude parents from this serious decision—can be addressed in a pre-enforcement posture.

## STANDARD OF REVIEW

This Court reviews a dismissal based on standing de novo. *Remijas*, 794 F.3d at 691. When standing is assessed at the motion-to-dismiss stage, courts must "accept as true all material allegations of the complaint, drawing all reasonable inferences therefrom in the plaintiff's favor." *Id*. (citations omitted).

## ARGUMENT

An organization has associational standing if: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Milwaukee Police Ass'n v. Flynn*, 863 F.3d 636, 639 (7th Cir. 2017) (cleaned up). The Defendants have conceded factors (2) and (3). Dkt. 12:7; RSA 8. Defendants argued, and the District Court accepted, that Plaintiff's members do not have standing absent allegations that the Policy has already been applied to their children. They are wrong, for multiple reasons.

## I.     The District's Policy Presently Injures Plaintiff's Members

While standing "in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, [ ], it often turns on the nature and source of the claim asserted." *Warth v. Seldin*, 422 U.S. 490, 500 (1975) (citation omitted). And the Supreme Court has made clear that "intangible harms can … be concrete" for purposes of Article III standing; such harms can "include harms specified by the Constitution itself." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021).

### A.     The Policy Transfers Parents' Decision-Making Authority from Them to the School and/or Minor Students.

The Supreme Court has repeatedly framed parents' constitutional rights in terms of their *decision-making authority* over their own minor children. *Supra* Background Part A. And it is the "decisional framework" that matters—the

government must apply a "presumption that a fit parent will act in the best interest of his or her child," *Troxel*, 530 U.S. at 69 (plurality op.), and may only override parents' decisions after providing procedural due process (notice and a hearing) and a high substantive standard, such as "clear and convincing evidence" of harm or abuse, *id.*; *Stanley*, 405 U.S. at 651. The government may not "transfer the power to make [a] decision from the parents to some agency or officer of the state," "[s]imply because the decision of a parent is not agreeable to a child or because it involves risks." *Parham*, 442 U.S. at 603.

Yet that is exactly what the District has done through its Policy—it has "transfer[red] the power to make [the] decision" about whether a minor child should "transition" to a different "gender identity" from the parents to school staff and the children themselves. That transfer of decision-making power violates the members' constitutional rights,[11] and is sufficient injury, standing alone, for Article III standing. It is a "harm[ ] specified by the Constitution itself." *TransUnion LLC*, 141 S. Ct. at 2204.

---

[11] Multiple courts have found a violation of parents' constitutional rights by a school district policy that eliminates parental involvement in significant, health-related decisions. *Ricard v. USD 475 Geary Cnty., KS Sch. Bd.*, No. 5:22-CV-4015, 2022 WL 1471372, at *8 (D. Kan. May 9, 2022) (holding that parents' decision-making authority necessarily "includes the right … to have a say in what a minor child is called and by what pronouns they are referred"); *Alfonso v. Fernandez*, 195 A.D.2d 46, 48, 606 N.Y.S.2d 259 (1993) (holding that a school's plan to "dispense condoms to unemancipated minor children without the consent of their parents or guardians, or an opt-out provision," violates parents' constitutional rights under the Fourteenth Amendment).

*Arizona State Legislature v. Arizona Independent Redistricting Commission*, 576 U.S. 787, 800 (2015), provides an apt comparison. The Arizona Legislature challenged, as a violation of the Constitution's Elections Clause, an amendment to the Arizona Constitution that transferred "redistricting authority from the Arizona Legislature and vest[ed] that authority in an independent commission." 576 U.S. at 792. In analyzing standing, the Court emphasized the nature of the Legislature's claim—that "the Elections Clause vests in it 'primary responsibility' for redistricting," such that the Legislature "must have at least the opportunity to engage (or decline to engage) in redistricting before the State may involve other actors in the redistricting process." *Id*. at 800. Arizona's constitutional amendment, however, "g[ave] [an independent body] binding authority over redistricting, regardless of the Legislature's action or inaction, strip[ping] the Legislature of its alleged prerogative to initiate redistricting." *Id*. Although the Court ultimately rejected the claim on the merits, *id*. at 804–24, it held that the Arizona Legislature had standing to bring this claim because "th[e] asserted deprivation"—the loss of "primary responsibility for redistricting"—was an injury that "would be remedied by a court order enjoining the enforcement of [Arizona's constitutional amendment]." *Id*. at 800.

This case mirrors that one. The claim is that parents have the "primary responsibility" for decisions involving their own children, yet the District's Policy "strip[s] [them] of [their] alleged prerogative" to decide whether a gender identity transition is in their child's best interests. *Id*. And the Policy allows "other actors"— school officials—to make this decision "regardless of the [parent]'s action or inaction,"

23

*id.*, and then to hide it from them. And this transfer of decision-making authority "would be remedied by a court order enjoining the enforcement of [the District's policy]." *Id.*

In line with this case, multiple lower courts have held that parents' loss of their right to consent to major decisions involving their own children is a sufficient injury, standing alone, for purposes of standing. In *Deanda v. Becerra*, No. 2:20-CV-092-Z, 2022 WL 17572093, *3–*6 (N.D. Tex. Dec. 8, 2022), for example, the court held that a parent had standing to challenge federal HHS regulations that require grant recipients to provide family planning services to minors without parental consent. The Court agreed that the "loss of his state-law right to consent" is an "injury in fact" because "[t]he violation occurs when the rights were taken away in the first instance" and "transferred to someone else"—parents "need not wait for an actual medical situation to arise before suing to recover his right to consent." *Id.* at *3 and n.1.[12]

Similarly, in *Parents United for Better Sch., Inc. v. Sch. Dist. of Philadelphia Bd. of Educ.*, 166 Pa. Cmwlth. 462, 646 A.2d 689 (1994), a Pennsylvania appellate court, relying on "federal interpretation of standing principles," held that parents had standing to challenge a program to distribute condoms in school without express

---

[12] Contrary to the District Court's treatment of this case, RSA 16 n.3, *Deanda* did not rely exclusively on the loss of a state law right to consent under Texas law. The court also found standing for the plaintiff's Fourteenth Amendment claim for similar reasons—because the regulations "subvert[ed] Plaintiff's authority as a parent." *Id.* at *4–*5. Regardless, parents have the same right to consent under Wisconsin common law. *See In re Sheila W.*, 2013 WI 63, ¶¶16–24, 348 Wis. 2d 674, 835 N.W.2d 148 (Prosser, J., concurring) (explaining that Wisconsin has not adopted a "mature minor" doctrine and noting that the "general rule" in Wisconsin "requir[es] parents to give consent to medical treatment for their children.").

24

parental consent. "The principle that parental consent must be secured before medical treatment provided is time honored and has been recognized by both the courts and the legislature," the Court emphasized, and this "substantial interest" was "directly" and "immediate[ly]" "affected by the" District's policy. *Id*. at 691, 693.

That this transfer of decision-making authority is an injury in and of itself is reinforced by the obvious point that, absent a lawsuit, parents have no way to reclaim their decision-making role now that the District has usurped it. *See Doe 1 v. Madison Metro. Sch. Dist.*, 2022 WI 65, ¶92, 403 Wis. 2d 369, 976 N.W.2d 584 (Roggensack, J., dissenting) ("Parents will not be told that their child is socially transitioning to a sex different from that noted at birth without the child's consent, yet social transitioning is a healthcare choice for parents to make. Without an injunction, the parents have no way of becoming involved in such a fundamental decision.").[13] Again, the District's Policy allows staff to make critical, health-related decisions for children without even *notifying* the parents, and the Policy even prohibits staff from discussing this with parents, solely because a child "do[es] not want [their] parents to know." SA 33. It should go without saying that parents cannot be expected to know what the District is concealing from them.

The District's Policy applies to all children in the District, at all times. All parents with children in the District are subject to it. And the Policy does not provide parents with any notice or hearing before circumventing and overriding their

---

[13] The majority in this case remanded entirely for procedural reasons and did not address the merits, or standing. *Id*. ¶¶ 30–40.

parental authority. Nor does it require any evidence or even a bare allegation of harm before usurping the parental role—it allows staff and minor children to make this major decision in secret from parents solely at a child's request. SA 33; Dkt. 12:3; Dkt. 12:17. As such, the Policy facially violates all parents' constitutional rights. The loss of Plaintiff's members' decision-making authority with respect to their own minor children directly injures them; that injury is caused by the District's Policy; and a decision in their favor would redress that injury by restoring their parental authority over this decision. *TransUnion LLC*, 141 S. Ct. at 2203.

### B.    The Supreme Court Has Recognized That Parents Have Standing to Challenge School Policies.

The Supreme Court has also recognized that parents have standing to challenge a school policy to which they and their children are subject. *Parents Involved*, 551 U.S. at 718–720. That case involved a challenge to a racially discriminatory admission policy, and the Court held that parents had standing even though there was no guarantee that the policy would be applied to any particular child, because race only served as a tiebreaker for admission to certain "oversubscribed" schools. *Id*. at 710. The school district argued the parents "can[not] claim an imminent injury," because they would "only be affected if their children seek to enroll in a Seattle public high school and choose an oversubscribed school that is integration positive," such that the racial tiebreaker was triggered. The Court brushed this argument aside as "unavailing." The Court emphasized, *first and foremost*, that the parents all "have children in the district's elementary, middle, and

26

high schools," are subject to the policy, and therefore "may be 'denied admission to the high schools of their choice when they apply for those schools in the future,'" pursuant to the policy. *Id.* (emphasis added). The fact that "[some] children of group members will not be denied admission to a school based on their race—because they choose an undersubscribed school or an oversubscribed school in which their race is an advantage—does not eliminate the injury claimed." This case has the same posture—Plaintiff's members all have children in District schools and are subject to a policy that, on its face, violates parents' constitutional rights. *See also Zorach v. Clauson*, 343 U.S. 306, 309 n.4 (1952) (finding "[n]o [jurisdictional] problem" to a challenge to the New York City schools' "released time" program because the challengers were "parents of children currently attending schools subject to the released time program.").

The District Court distinguished *Parents Involved* as relying on a conclusion that "*every* student enrolled in the school district would be 'forced to compete in a race-based system that may prejudice' them." RSA 15 (emphasis in original). But that reads the case too narrowly; that was an *alternative* and secondary injury sufficient for standing. 551 U.S. at 719 ("*Moreover*, Parents Involved *also* asserted an interest in not being forced to compete…"). The main point the Court emphasized relative to standing was that "the group's members have children in the district's elementary, middle, and high schools," and sought "declaratory and injunctive relief" against a Policy that "may" affect them "in the future." *Id.* at 718. The same is true here, except that Plaintiff's members' standing is even more compelling than it was in *Parents*

27

*Involved* given the secrecy from parents, preventing them from knowing when the Policy has been applied to their children.

### C.  The District's Policy Denies Plaintiff's Members' Access to Information to Which They Are Entitled

The Supreme Court has also recognized that an "inability to obtain information" to which one is entitled is a cognizable "injury in fact" for purposes of Article III standing. *See Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998); *Spokeo v. Robins*, 578 U.S. 330, 342 (2016); *Public Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 449 (1989). Separate from the transfer of decision-making authority, the District's Policy also directly—and presently—denies Plaintiff's members' access to information about their own children to which they are entitled, both as a constitutional matter and as a matter of federal law. The denial of this right to information, provided by the Constitution and by statute, constitutes concrete harm under *Spokeo*, *Public Citizen*, and *Akins*.

Although there are not (yet) many cases litigating whether a school can conspire to hide serious health-related information from parents about their own children—because, until recently, schools have never done this—some courts have recognized that, as a corollary to their decision-making authority, parents have a right to be informed of situations that require a decision by them, as here. In *Gruenke v. Seip*, 225 F.3d 290 (3d Cir. 2000), for example, a high school swim coach suspected that a team member was pregnant, and, rather than notifying her parents, discussed the matter with others, eventually pressuring her into taking a pregnancy test. *Id.* at

295–97, 306. The mother sued the coach for a violation of parental rights, arguing that the coach's "failure to notify her" "obstruct[ed] the parental right to choose the proper method of resolution." *Id.* at 306. Although the Court held that the defendants were entitled to qualified immunity (unlike here, the case was a suit for damages), the court found that the mother had "sufficiently alleged a constitutional violation" and condemned the "arrogation of the parental role": "It is not educators, but parents who have primary rights in the upbringing of children. School officials have only a secondary responsibility and must respect these rights." *Id.* at 306–07. And, although the Court concluded it "need not consider the potential liability of school counselors here," it nevertheless expressed "considerable doubt about their right to withhold information of this nature from the parents." *Id.* at 307.

Furthermore, it is beyond dispute that parents have a constitutional right to remove their children from public school. *Pierce*, 268 U.S. 510. As the complaint explains, Plaintiff's members do not want the adults around their young children for most of the day treating their children as the opposite sex. SA 19 ¶92. If this were happening, it would be directly relevant to whether they continue to send their children to public school; yet the District's Policy denies parents information they need to make that decision. When government action makes the exercise of a Constitutional right impossible or nearly so, that alone constitutes a violation of the right. *See e.g., Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("The Second Amendment … does not explicitly protect ammunition. Nevertheless, without bullets, the right to bear arms would be meaningless. … Thus,

the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them.") (cleaned up). The same principle applies here. Because parents have the "maturity, experience, and capacity for judgment" necessary to make medical decisions and provide informed consent for their children, *Parham*, 442 U.S. at 602, intentionally hiding information from them that is critically important to making informed choices violates their right to direct the upbringing of their children. If Constitutional rights are to mean anything at all, they cannot be so easily circumvented. Again, Plaintiff's position is that parents have a constitutional right to make the decision about whether a social transition to a different gender identity is in their child's best interests. But parents *at the very least* have a right to be *notified* that District staff are treating their child as the opposite sex while at school so that they can pull their child from school if this is happening, as they indisputably have the right to do.

Plaintiff's members also have a right to notice under the Protection of Pupil Rights Amendment (or "PPRA"), 20 U.S.C. § 1232h, and its implementing regulations, including 34 CFR § 98.4(a). Section 1232h(b) provides, in relevant part, that "[n]o student shall be required … to submit to a survey, analysis, or evaluation that reveals information concerning … mental or psychological problems of the student or the student's family; sex behavior or attitudes; … [or] critical appraisals of other individuals with whom respondents have close family relationships"— without prior parental notice and consent. *See* 20 U.S.C. §§ 1232h(b)(2), (3), (5). This

describes exactly what occurs when the District completes a Gender Support Plan for a student with school staff. SA 2, 5–7 ¶¶3, 23–33.

The implementing regulation, 34 CFR § 98.4, likewise provides that no student shall be required to submit to a psychiatric or psychological examination, testing, or treatment in which the primary purpose is to reveal information concerning "sex behaviors and attitudes," without prior parental consent. A "Psychiatric or psychological examination or test" is defined as "a method of obtaining information … that is not directly related to academic instruction and that is designed to elicit information about attitudes, habits, traits, opinions, beliefs or feelings." 34 CFR § 98.4(c)(1). Again, this perfectly captures the questions in the Gender Support Plan form. "Psychiatric or psychological treatment" is defined separately as "an activity involving the planned, systematic use of methods or techniques that are not directly related to academic instruction and that [are] designed to affect behavioral, emotional, or attitudinal characteristics of an individual or group." 34 CFR § 98.4(c)(2). The District's gender transition measures—using a new name and pronouns for a student and allowing the student to use opposite-sex facilities—squarely fit this definition.

Through its Policy, the District has erected a roadblock to information about what is happening at school. This constitutes an injury in fact for standing purposes, as Plaintiff's members are currently deprived of their right to know what is happening with their children. It is not a future harm, it is a current, ongoing harm.

### D.     The Policy Presently Harms Parent-Child Relationships

The existence of the District's Policy, and the District's communication about it to students, also presently harms parent-child relationships and trust for all parents in the District. As noted above, the District's Policy gives students the "right" to change name and pronouns and facility use at school, and to keep this a secret from their parents. SA 28; *supra* Background Part C. And it "encourage[s]" "transgender, non-binary, and/or gender-nonconforming student[s]" to "contact a staff member" about gender transitions. SA 27. The District has trained its staff that "parents are not entitled to know their kids' identities," SA 8 ¶36; SA 38, and those staff (or the District itself) have undoubtedly communicated that Policy to students as well. Indeed, as noted in the complaint, one teacher has even told students, "If your parents aren't accepting of your identity, I'm your mom now." SA 10–11 ¶48.

The very presence of this Policy, and communication by the District to students that they can keep what is happening at school secret from their parents, necessarily breeds distrust of parents and harms the parent-child relationship. Indeed, as Plaintiff alleges, the District's "policy and practices make [it] more likely [that] students struggling with these issues [will] come to teachers first," rather than their parents, by "openly encouraging" this. SA 14 ¶60.

As noted briefly above, the Supreme Court, this Court, and other federal circuits have recognized that the Constitution protects "the relationship between parent and child," *Quilloin*, 434 U.S. at 255; *Brokaw*, 235 F.3d at 1019 ("familial relationship[s]"), and that "the bonds between parent and child are … sacrosanct,"

32

*Jordan*, 15 F.3d at 342–43. The existence of the Policy alone directly harms those relationships by communicating to minor students that secrets from their parents—including an entire double life at school—are not only acceptable, but will be facilitated by the District upon request. This injures Plaintiff's members' relationship with their children right now.

## II.     Plaintiff's Members Have Standing to Prevent Future Injuries

### A.     The District's Policy Creates a Substantial Risk of Harm to Plaintiff's Members and to Their Children

Even setting aside the present injuries to Plaintiff's members, *supra* Part I, the Supreme Court has repeatedly recognized that "a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *TransUnion LLC*, 141 S. Ct. at 2210; *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur."); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) ("Our cases do not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about. In some instances, we have found standing based on a "substantial risk" that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm." (listing cases)). This Court has also recognized that "future injuries [can] support Article III standing." *Remijas*, 794 F.3d at 693.

The District's Policy creates a "substantial risk" of multiple kinds of injury to Plaintiff's members. First, the District's Policy threatens significant, long-term harm to Plaintiff's members' children. As Plaintiff's complaint alleges, many mental-health professionals believe that "treating a child as if he or she is the opposite sex by using a different name and pronouns can do *long-term harm to the child*." SA 12, 14 ¶¶52, 61 ("long-term damage"); *supra* Background Part B. And a child's struggle with gender identity can "arise [first] at school, unbeknownst to parents," who have "no way to know, in advance, if or when their children" will experience this. SA 14 ¶¶58–59. This Court must accept those allegations as true at the motion-to-dismiss stage, and they alone support a "substantial risk" of harm to Plaintiff's members' children that can be remedied by prospective declaratory and injunctive relief.

Second, the Policy also creates a substantial risk that Plaintiff's members will be unable to obtain professional support for their children struggling with their gender identity. Gender dysphoria "can … be a serious mental-health condition that requires professional help." SA 15 ¶67. Gender dysphoria is also frequently associated with "other comorbidities, including depression, anxiety, and suicidal thoughts [that] may urgently need professional support." *Id.* at ¶68. And a child's request to socially transition is "a well-recognized indicator that the child may be dealing with gender dysphoria and should be professionally evaluated." *Id.* at ¶69. Again, these allegations alone, which this Court must accept as true, sufficiently establish a "substantial risk" of harm for purposes of Article III standing.

Third, the Policy creates a substantial risk that Plaintiff's members will be unable to exercise their parental right to deny consent and say "no" to a gender transition and instead choose a treatment approach to help their child struggling with gender identity find comfort with his or her body, as the complaint alleges Plaintiff's members want to be able to do. SA 18–19 ¶¶86, 92, 96.

As explained above, Plaintiff's position is that the transfer of decision-making authority from parents to the District *itself* violates parents' rights, even before the District makes the decisions reserved for parents, *supra* Part I.A; but even if this Court disagrees with that, the Policy at the very least creates a "substantial risk" of a significant constitutional violation. That this case involves the "oldest of the fundamental liberty interests recognized by th[e] [Supreme] Court," *Troxel*, 530 U.S. at 65 (plurality op.), a right "far more precious … than property rights," *May*, 345 U.S. at 533, should weigh heavily in the "substantial risk" calculus for purpose of standing, as it does for injunctive relief. *See Vitolo v. Guzman*, 999 F.3d 353, 360, 365 (6th Cir. 2021) ("When constitutional rights are threatened or impaired, irreparable injury is presumed."). 11A Wright & Miller, *Fed. Prac. & Proc.* § 2948.1 (3d ed. 2022) ("When an alleged deprivation of a constitutional right is involved … most courts hold that no further showing of irreparable injury is necessary."); *Wisconsin Right To Life, Inc. v. Barland*, 751 F.3d 804, 830 (7th Cir. 2014); *Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013).

Not only are these harms "substantial," they are also at all times "imminent" given that the District will facilitate transitions at school in secret from parents,

without even notifying them. Indeed, the District may well be *currently violating* some of Plaintiff's members' constitutional rights, without their awareness. SA 17 ¶82 (alleging that the Policy "prevent[s] PPOC's members from knowing if the school has already applied this policy to their children"); SA 14, 17, 19–22 ¶¶58–60, 84, 97, 103, 114. And since the District concedes that it will—solely upon a minor's request— hide a constitutional violation from parents, the *only way* for parents to protect their children from "long-term damage," SA 14 ¶61, and to preserve their constitutionally-protected decision-making role, is to challenge the District's Policy now. Indeed, as the Supreme Court emphasized in *TransUnion LLC*, the very purpose of "forward-looking, injunctive relief" (as is sought here), is to "prevent the harm from occurring." 141 S. Ct. at 2210.

Parents do not have to wait until the Policy has been applied to their children, and substantial harm done to them, and then *hope* that they discover it, notwithstanding the District's Policy of secrecy. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007) ("[W]here threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced.") (emphasis in original). Plaintiff's members are in a unique position: if they cannot preemptively challenge the Policy, then they will be *required* to suffer the harm before they are capable of challenging the Policy because Defendants will take action without notifying them or obtaining parental consent and then actively hide the harm from them. In fact, under Defendants' theory, Plaintiff's

member parents may never be able to challenge the harms imposed on them, provided that Defendant succeeds in keeping them in the dark.

An example illustrates this point. Imagine that a school adopted a policy to allow staff to administer experimental drugs to minors and hide this from parents who might object, solely upon a child's request. No court would require parents to wait until a drug had been administered to challenge such a policy. It is no different here: the District has a policy that if any student suffers from gender identity issues, the school will immediately provide the experimental treatment of social transition and will not notify parents who might object. SA 14–15 ¶¶63–64.

There is nothing "'conjectural" or "hypothetical" about the legal question here. The District says exactly what it will do with respect to student social transitions. It will exclude parents from this major decision by making the decision itself—and hide it from parents—solely at a child's request (but with input and influence from teachers and staff). The question is whether that is constitutional. It is not.

This Court's decision in *Remijas* provides further support for Plaintiff's standing here under a "substantial risk" analysis. In that case, the plaintiffs all had their identity stolen through a hack that targeted the defendant's customers. 794 F.3d at 690, 693. Some plaintiffs suffered fraudulent charges, while a majority had not. *Id.* at 690. This Court emphasized that "plaintiffs have shown a substantial risk of harm from the [defendants'] data breach," given the targeted hack: "Why else would hackers break into a store's database and steal consumers' private information?

Presumably, the purpose of the hack is, sooner or later, to make fraudulent charges or assume those consumers' identities." *Id.* at 693.

The same is true here. The District would not have such a Policy, much less defend it in Court, unless it intended to apply it, and discovery will likely show that the District *is currently applying it*. Moreover, in their training, Defendants have specifically targeted religious parents who might object to a gender identity transition on religious grounds (among other reasons). *Supra* pp. 16–18. Most of Plaintiff's members are such parents. SA 18–19 ¶¶90–93, 96. Thus, Plaintiff's members are more likely than others to have the District hide things from them. All of Plaintiff's member parents are the kind who object to the policy, so they are, by definition, the ones most likely to be deemed "unsupportive" and kept in the dark, partly by virtue of their participation in this very litigation. As in *Remijas*, where hackers targeted the defendant's customers, here Defendants' Policy targets Plaintiff's members and their children.

The District Court held that these risks were too speculative because Plaintiff did not allege that Defendants have yet applied the Policy to hide a transition from any of Plaintiff's members (that Plaintiff knows of). RSA 10. Yet the very thing they are challenging is the secrecy from parents, precisely because they would not necessarily know if the District were applying the Policy to their child. Plaintiff clearly alleged that the District's Policy "prevent[s] PPOC's members from knowing if the school has already applied this policy to their children," SA 17 ¶82, in part

because this can arise at school "unbeknownst to parents." SA 14 ¶¶58–59. The District Court disregarded these allegations.

The Court also ignored—failing to even mention—Plaintiff's allegations about the *magnitude* of the harm from a secret transition at school, *e.g.*, SA 12–13 ¶52 ("long-term harm"); SA 14 ¶61 ("long-term damage"); *Id.* at ¶63 ("psychosocial experiment"), about the importance of obtaining a professional evaluation to screen for gender dysphoria and other comorbidities, SA 15 ¶¶67–69, and the allegations showing that the District specifically targets religious parents, SA 8–9 ¶¶37–43, like Plaintiff's members, SA 18–19 ¶¶90–96, increasing the risk to them.

The fact that the Policy does not mandate hiding a transition from parents in all situations, which the District Court emphasized, RSA 9–10, is beside the point. The Policy *allows* hiding a transition from parents, solely because a child does not "want [their] parents to know," SA 33, and it does mandate secrecy from parents upon such a request. R.1-3:3; *supra* pp. 13–14, 27. That alone is unconstitutional and injures Plaintiff's members.

Finally, the fact that a "[Gender Support] Plan will not be kept confidential from the student's parents if they ask for it" is also irrelevant to Plaintiff's members' standing, for multiple reasons. RSA 20. First, as explained above, a Gender Support Plan is not required before the District will begin addressing a child as if he or she is the opposite sex and permit the child to begin using opposite-sex facilities (and even overnight lodging accommodations). *Supra* pp. 13–14 and n.13. Indeed, the "warning" to students at the top of the form seems designed to avoid creating a record parents

can access. *Id.* Second, if parents are not told that the District is meeting with their child and implementing a social transition plan, they will not know to ask for it. Third, even in situations where the parents could find out what is happening at school by proactively requesting a Gender Support Plan they do not know exists, by then the harm will already have occurred. Finally, requiring parents to repeatedly and periodically ask the school whether it has a secret Gender Support Plan for their child is exactly the kind of "cost" that the Court in *Clapper* said would support standing: "[W]e have found standing based on a 'substantial risk' that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm." 568 U.S. at 414 n.5; *see also FEC v. Cruz*, 142 S. Ct. 1638, 1647–48 (2022).

### B.    Plaintiff Can Bring a Pre-enforcement Challenge

The Supreme Court has also recognized standing to bring pre-enforcement challenges to the threatened application of an unconstitutional statute, rule, or policy. *Susan B. Anthony List*, 573 U.S. at 158–59 (citing *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289 (1979) and *Steffel v. Thompson*, 415 U.S. 452 (1974)). In such cases, what matters for purposes of standing is that the plaintiff faces a credible threat of the policy's application and that the court can adequately assess the merits of the claim in a pre-enforcement posture. *Am. C.L. Union of Illinois v. Alvarez*, 679 F.3d 583, 594 (7th Cir. 2012); *see also Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati,* 822 F.2d 1390, 1394–95 (6th Cir. 1987). While these cases often involve a government-threatened penalty for exercising a constitutional right, the Supreme Court has applied the principle more broadly,

including, for example, in a patent dispute between private parties. *E.g.*, *MedImmune,* 549 U.S. 118.

This case is analogous to the pre-enforcement line of cases in multiple ways. First, the rationale behind these cases is that individuals should not be put to the "choice between abandoning [their] rights or risking prosecution—[the kind of] dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate." *MedImmune*, 549 U.S. at 129. Here, the District's Policy puts parents to the same kind of impossible choice (especially given that the District will hide transitions from parents): parents must either withdraw their children from school, abandoning their right to a free public education (Wis. Const. art. X, § 3), or risk serious harm to their children and infringement of their parental rights. Parents should not have to "expose [themselves and their children] to [these serious harms] before bringing suit to challenge the basis for the threat." *Susan B. Anthony List*, 573 U.S. at 159 (quoting *MedImmune*, 549 U.S at 128–29).

Second, the District's Policy effectively punishes parents for "engag[ing] in a course of conduct arguably affected with a constitutional interest." *Susan B. Anthony List*, 573 U.S. at 160 (quoting *Babbitt*, 442 U.S. at 298). As alleged in the complaint, Plaintiff's members would not "immediately 'affirm' whatever beliefs their children might have about their gender," and would not immediately "allow their young child[ren] to make a gender-role transition," but would instead first help them process what they are feeling and why, as many experts recommend, SA 11–12, 14, 19 ¶¶51, 57, 92—a decision they have a right to make as parents. Yet this is the exact criteria

41

the District uses to keep parents in the dark. SA 28 ("lack of acceptance"); Dkt. 12:17 (defending the Policy as protecting students from "potentially unsupportive parents"); Dkt. 12:24 (same); SA 8–10 ¶¶37–44. In other words, the District punishes parents who would not agree to a transition by excluding them from the decision and hiding it from them.

This case is a constitutional challenge to a District Policy that, on its face, violates the most fundamental of all the liberty interests protected by the Due Process Clause—the right of Plaintiff's members to raise their children, direct their children's medical care, religious upbringing, and education. SA 16–20, 23–24 ¶¶77–88, 89–99, 118–126; *Troxel*, 530 U.S. at 65 (plurality op.). Plaintiff's members face a "credible threat" that this Policy will be applied to them and their children, and even in a pre-enforcement posture, the federal courts can easily assess their claim that school districts may not exclude parents from this major decision.

## CONCLUSION

The District's Policy presently violates parents' constitutional rights by transferring their decision-making authority to school staff, withholding information from them, and interfering with the parent-child relationship. And the Supreme Court has recognized that parents have standing to challenge school policies that facially violate their constitutional rights. The Policy also creates a substantial risk of harm to Plaintiff's members and their children, which is imminent at all times because the Policy itself prevents parents from learning when it has been applied to their children. Plaintiff also raises a valid pre-enforcement challenge. For any or all

of these reasons, this Court should reverse the District Court's dismissal based on standing.

Dated: May 1, 2023.

Respectfully submitted,

WISCONSIN INSTITUTE FOR
LAW & LIBERTY, INC.

/s/ Luke N. Berg

Luke N. Berg
*Counsel of Record*
Richard M. Esenberg
330 E. Kilbourn Avenue, Suite 725
Milwaukee, WI 53202
Telephone: (414) 727-9455
Facsimile: (414) 727-6385
Luke@will-law.org
Rick@will-law.org

AMERICA FIRST LEGAL FOUNDATION

Nicholas R. Barry
Reed D. Rubinstein
300 Independence Ave SE
Washington, DC 20003
Telephone: (202) 964-3721
Nicholas.Barry@AFLegal.org
Reed.Rubinstein@AFLegal.org

*Attorneys for Parents Protecting Our Children, UA*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g), I certify the following:

This brief complies with the type-volume limitation of Cir. R. 32(c) because it contains 11,133 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Cir. R. 32(b) for a brief produced with a proportionally spaced font using the 2016 version of Microsoft Word in 12-point Century Schoolbook font.

Dated: May 1, 2023.

/s/ Luke N. Berg
_____
LUKE N. BERG

**CIRCUIT RULE 30(d) CERTIFICATE**

Pursuant to Circuit Rule 30(d), I certify that the appendices bound with and accompanying this brief contain all of the materials required by Circuit Rule 30 (a) and (b).

Dated: May 1, 2023

/s/ Luke N. Berg
LUKE N. BERG

## INDEX OF REQUIRED SHORT APPENDIX

**Description of Document**                                    **Page(s)**

District Court's Decision and Order
(February 21, 2023) (ECF No. 20)...............................................RSA 1–20

District Court's Final Judgment
(February 22, 2023) (ECF No. 21).................................................RSA 21

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

Parents Protecting Our Children, UA,

                Plaintiff,

     v.

Eau Claire Area School District, Wisconsin; Tim Nordin;
Lori Bica; Marquell Johnson; Phil Lyons;
Joshua Clements; Stephanie Farrar; Erica Zerr; and
Michael Johnson,

                Defendants.

OPINION AND ORDER

22-cv-508-slc

---

      Plaintiff Parents Protecting Our Children is an unincorporated association (UA) of parents whose children attend schools within defendant Eau Claire Area School District in Wisconsin. The remaining defendants are school officials who are being sued in their official capacities. Plaintiff alleges that defendants' internal guidance on the treatment of transgender, non-binary, and gender-nonconforming students violates the following constitutional and statutory rights of its members: (1) the care, custody, and control of their children under the due process clause of the Fourteenth Amendment and the Wisconsin Constitution; (2) the free exercise of religion under the First Amendment and the Wisconsin Constitution; and (3) the right to obtain information and opt out of specified public school activities under the Protection of Pupil Rights Amendment (PPRA), 20 U.S.C. § 1232h. Plaintiff seeks to enjoin defendants from relying on, using, implementing, or enforcing the guidance.

      Before the court is defendants' motion to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of standing and under Rule 12(b)(6) for failure to state a claim. Dkt. 11. The court also has received a motion for leave to file an amicus curiae brief submitted by the Eau Claire Area LGBTQI+ Community in support of defendants. Dkt. 10.

      For the reasons stated below, I am granting defendants' motion to dismiss this case for lack of standing. I am denying the motion for leave to file an amicus curiae brief because the amicus brief does not help resolve the question of standing.

## FACTUAL ALLEGATIONS

When considering a motion to dismiss for lack of standing or for failure to state a claim, the court accepts as true all material allegations of the complaint, drawing all reasonable inferences therefrom in plaintiff's favor unless standing is challenged as a factual matter. *Bria Health Services, LLC v. Eagleson*, 950 F.3d 378, 381-82 (7th Cir. 2020). Defendants do not challenge this court's reliance on the facts in the complaint for the purpose of deciding their motion, although they reserve the right to contest plaintiff's allegations in the future. Def. Br. in Support, dkt. 12, at 2, n.2. This is what plaintiff alleges:

### I.  The Parties

Plaintiff Parents Protecting Our Children, UA, is a group of parents who have created an unincorporated nonprofit association in accordance with Wis. Stat. § 184.01. The unidentified members of the association reside in the Eau Claire Area School District (ECASD) and have children who attend ECASD schools. Plaintiff names ECASD as a defendant, along with District Superintendent Michael Johnson and these members of the Eau Claire Area Board of Education: Tim Nordin, president; Lori Bica, vice president; Marquell Johnson, clerk/governance officer; Phil Lyons, treasurer; and members Joshua Clements, Stephanie Farrar, and Erica Zerr.

### II.  Gender Identity Support Guidance, Plan, and Training

ECASD has adopted a district-wide internal policy titled "Administrative Guidance for Gender Identity Support"(the Guidance), which initiates a process under which a school and its staff create a "Gender Support Plan" with a student. Attached to plaintiff's complaint is a complete copy of the guidance, a blank and fillable copy of a gender support plan, and a copy of a facilitator guide for staff training on "safe spaces." Dkt. 1-3 to 1-5. Here is a summary of the relevant portions of these documents:

## A.  The Guidance

The first two and a half pages of the Guidance state the following purpose and process:

### I.  Purpose:

The purpose of this Guidance is: 1) to foster inclusive and welcoming environments that are free from discrimination, harassment, and bullying regardless of sex, sexual orientation, gender identity or gender expression; and 2) to facilitate compliance with district policy.

For the purpose of this Guidance, a transgender individual is an individual that asserts a gender identity or gender expression at school or work that is different from the gender assigned at birth. . . .

This Guidance is intended to be a resource that is compliant with district policies, local, state, and federal laws. They are not intended to anticipate every possible situation that may occur.

### II.  The Process:

The following guidelines should be used to address the needs of transgender, nonbinary, and/or gender non-conforming students:

a.  A transgender, non-binary, and/or gender-nonconforming student is encouraged to contact a staff member at the school to address any concerns, needs, or requests. This staff member will notify and work with the principal/designee. Parents/guardians of transgender, non-binary, and/or gender non-conforming students may also initiate contact with a staff member at school.

b.  When appropriate or necessary, the principal or designee will schedule a meeting to discuss the student's needs and to develop a specific Student Gender Support Plan when appropriate to address these needs. Documentation shall include date, time, location, names, and titles of participants, as well as the following information. The plan shall address, as appropriate:

1.  The name and pronouns desired by the student (generally speaking, school staff and educators should inquire which terms a student may prefer and avoid terms that make the individual uncomfortable; a good general guideline is to employ those terms which the individual uses to describe themself

3

2. Restroom and locker room use

3. Participation in athletics and extracurricular activities

4. Student transition plans, if any. Each individual transitions differently (if they choose to transition at all), and transition can include social, medical, surgical, and/or legal processes

5. Other needs or requests of the student

6. Determination of a support plan coordinator when appropriate

\*   \*   \*

Administrators and staff should respect the right of an individual to be addressed by a name and pronoun that corresponds to their gender identity.  *A court-ordered name or gender change is not required, and the student need not change their official records*.

Dkt. 1-3 at 1-2 (emphasis in original).

The Guidance also discusses media and communication, official records and legal name changes, sports and extracurricular activities, dress codes, student trips and overnight accommodations, and training and professional development.   Although the Guidance states that "[m]andatory permanent student records will include the legal/birth name and legal/birth gender," it provides that "to the extent that the district is not legally required to use a student's legal/birth name and gender on other school records or documents, the school will use the name and gender preferred by the student."  Dkt. 1-3 at 3.  "For example, Student ID cards are not legal documents, and therefore, may reflect the student's preferred name."  *Id.*

With respect to parents and guardians, the Guidance states that

Some transgender, non-binary, and/or gender-gender-nonconforming students are not "open" at home for reasons that may include safety concerns or lack of acceptance. School personnel should speak with the student first before discussing a student's gender nonconformity or transgender status with the student's parent/guardian.

Dkt. 1-3 at 2.

RSA 4

As plaintiff points out, the Guidance does not contain a requirement to notify a student's parents or guardian that the student is or will be using a new name or gender identity, except to the extent that "ECASD will only make name changes in Skyward[1] after the completion of a Gender Support Plan and with parent/guardian permission." *Id.* at 4. However, there are no provisions mandating secrecy apart from a general provision in the media and communication section, which states that:

> Protecting the privacy of transgender, non-binary, and/or gender non-conforming students and employees must be a top priority for the spokesperson and all staff. All student and personnel information shall be kept strictly confidential as required by District policy and local, state, or federal privacy laws.
>
> *Id.* at 3.

### B. Gender Support Plan

The gender support plan (the Plan) makes the following statements in a separate text box at the top of the first page:

> The purpose of this document is to create shared understanding about the ways in which the student's authentic gender will be accounted for and supported at school. School staff, family, and the student should work together to complete this document.
>
> If parents are not involved in creating this plan, and student states they do not want parents to know, it shall be made clear to the student that this plan is a student record and will be released to their parents when they request it. This is a not a privileged document between the student and the school district.
>
> Dkt. 1-4 at 1.

---

[1] "Skyward" is a software program used by ECASD to manage student records and similar information.

The form contains spaces for district staff to record a new name, pronouns, and gender for a child; select which intimate facilities (restroom, locker room, and overnight lodging on field trips) the child will use; and identify who should be told about the child's newly acquired gender identity (asking about district staff, building staff, and friends and classmates but not parents or guardians). *Id.* at 2. The Plan specifically asks if parents/guardians are aware of "their child's gender status" and "student's requests at school" with yes/no check boxes. The Plan identifies two actions to take if the "yes" box is checked with respect to parent knowledge: walking the parents through the Skyward name process and student ID card change and identifying preferred name, pronouns, and intimate facilities. The form does not identify any actions to take if a "no" box is checked. *Id.* There are also sections for planning for use of facilities, extracurricular activities, and supporting the student and any siblings. *Id.* at 3-4.

### C. Staff Training

Plaintiff alleges that ECASD has conducted training sessions for its teachers on the Guidance for which it prepared a "Facilitator Guide" for "Session 3: Safe Spaces." With respect to slide 56, titled "Talk amongst yourselves!," the guide directs the facilitator to guide a discussion and reminds facilitators that

> [P]arents are not entitled to know their kids' identities. That knowledge must be earned. Teachers are often straddling this complex situation. In ECASD, our priority is supporting the student.

> Dkt. 1-5 at 2.

The guide also discusses slide 57, titled "Religion":

> Since Slide 56 will most likely focus on parents' religious objections to LGBTQIA+ people, it's important to take a moment and reaffirm that religion is not the problem (after all, there are millions of queer people of various faith traditions); rather, it's the weaponization of religion against queer people.

> *Id.* at 3.

6

In addition, an online training session titled "Safe Spaces Part Two" states:

> We understand and acknowledge that teachers are often put in terrible positions caught between parents and their students. But much like we wouldn't act as stand-ins for abuse in other circumstances, we cannot let parents' rejection of their children guide teachers' reactions and actions and advocacy for our students.
>
> *   *   *
>
> We handle religious objections too often with kid gloves . . . . [If the parents' have a] faith-based rejection of their student's queer identity [then the school staff] must not act as stand-ins for oppressive ideas/behaviors/attitudes, even and especially if that oppression is coming from parents.

Dkt. 1, ¶¶ 38-39.

Plaintiff alleges that teachers understand the Guidance and training as a mandate to interfere with the parent–child relationship, pointing to a flyer posted by one teacher at North High School in ECASD, which states: "If your parents aren't accepting of your identity, I'm your mom now." Dkt. 1, ¶ 48.

OPINION

Defendants challenge the complaint under Rule 12(b)(1) for lack of standing, and under Rule 12(b)(6) for failure to state a claim. Because the court agrees that plaintiff lacks standing, this opinion will address only the first challenge under Rule 12(b)(1).

## I. Legal Standard Regarding Standing

A complaint must plausibly allege standing to survive a Rule 12(b)(1) challenge. *Larkin v. Fin. Sys. of Green Bay, Inc.*, 982 F.3d 1060, 1064 (7th Cir. 2020) ("At the pleading stage, the standing inquiry asks whether the complaint 'clearly . . . allege[s] facts demonstrating each element in the doctrinal test.'") (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as*

7

*revised* (May 24, 2016)); *Silha v. ACT, Inc.*, 807 F.3d 169, 173-74 (7th Cir. 2015); *Scruggs v. Nielsen*, 2019 WL 1382159, at *1 (N.D. Ill. Mar. 27, 2019).  An organization like plaintiff has associational standing to sue on behalf of its members if:  (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.  *Milwaukee Police Ass'n v. Flynn*, 863 F.3d 636, 639 (7th Cir. 2017); *United African Org. v. Biden*, 2022 WL 3212370, at *5 (N.D. Ill. Aug. 9, 2022).  Defendants argue that plaintiff cannot establish the first element because the plaintiff's individual parent members do not have standing in their own right.

To establish Article III standing, a litigant "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo,* 578 U.S. at 338 (internal citations omitted); *see also Wadsworth v. Kross, Lieberman & Stone, Inc.*, 12 F.4th 665, 667 (7th Cir. 2021) (citing same).  Disputed in the instant case is the injury-in-fact element, which requires "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo*, 578 U.S. at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)); *see also Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 332 (7th Cir. 2019) ("Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions.").  To be concrete, the injury "must be de facto; that is, it must actually exist."  *Spokeo,* 578 U.S. at 340 (internal quotation omitted).  "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'"  *Id.* at 339 (quoting *Lujan,* 504 U.S. at 560 n.1).

With respect to standing to seek injunctive relief, the Supreme Court has held that a "plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct."  *City of Los Angeles v. Lyons*, 461 U.S. 95,

8

101-02 (1983) (internal citations omitted); *see also Beley v. City of Chicago*, 2013 WL 3270668, at *3 (N.D. Ill. June 27, 2013) (Citing same for proposition that "[t]o establish standing for injunctive relief or a declaratory judgment, a party must show a real and immediate threat of injury.").

## II.  Injury In Fact

Plaintiff alleges that ECASD is providing "psychosocial medical/psychological care through transgender social transition" for which it is intentionally not obtaining parental consent.  Dkt. 1 at ¶¶ 64-65.  Plaintiff also alleges that the non-public nature of the policy and "secrecy with which schools are to operate" means there is no way for its parent members to determine if their child has been "targeted by the school."  Dkt. 1, ¶ 75.  In support of its allegations, plaintiff points out that the Guidance and Plan documents do not contain any minimum age limit or a requirement to notify the student's parents that the child is or will be using a new name or gender identity, opposite-sex intimate facilities, or opposite-sex overnight lodging during school activities.

According to plaintiff, defendants' Guidance "mandates" that schools and teachers hide critical information regarding a child's health from the child's parents and take action specifically designed to alter the child's mental and physical well-being, including:  (1) allowing and requiring district staff to change a child's name, pronouns, and intimate facility use without the parents' knowledge or consent; (2) requiring a school and its staff to hold secret meetings with children to develop a gender support plan; and (3) requiring school officials, teachers, and administrators to continue using the child's given name and pronouns when interacting with the child's parents as to not alert parents to the changes the school has made.  Complaint, dkt. 1, at 2, ¶2.  However, contrary to plaintiff's interpretation, a fair reading of the Guidance and Plan documents shows that they do not *mandate* the exclusion of parents and guardians.  *See John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, __ F. Supp. 3d __, 2022 WL 3544256, at *6-7

(D. Md. Aug. 18, 2022) (finding same in Rule 12(b)(6) review of similar guidelines related to student gender identity); *id*. at 7 ("My review of the Guidelines reveals that the Plaintiff Parents' argument is based on a selective reading that distorts the Guidelines into a calculated prohibition against the disclosure of a child's gender identity that aims to sow distrust among MCPS students and their families.").

Actually, defendants encourage family involvement in developing a gender support plan: "The purpose of this document is to create shared understanding about the ways in which the student's authentic gender will be accounted for and supported at school. School staff, family, and the student should work together to complete this document." Dkt. 1-4 at 1. True, the Guidance anticipates that some students may chose not to tell their parents about their gender nonconformity or transgender status, and it instructs school personnel to "[s]peak with the student first before discussing a student's gender nonconformity or transgender status with the student's parent/guardian," dkt. 1-3. That being so, the Guidance does not instruct staff to keep the information secret and it makes clear that the student's name will not be changed in the district's system without parent/guardian permission. Further, the Plan document clearly notes that the Plan will not be kept confidential from the student's parents if they ask for it. *Id.*

More critical to the standing analysis, however, is that plaintiff does not allege (1) that any of its members' children are transgender or gender nonconforming, (2) that the district has applied the gender identity support Guidance or Plan with respect to its members's children or any other children, or (3) that any parent or guardian has been denied information related to their child's identity. Defendants argue that plaintiff's general distress about the gender identity policy does not demonstrate an actual injury because plaintiff's fear that the policy might be applied to one of its members' children in the future is too speculative to confer standing. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) ("[W]e have repeatedly reiterated that 'threatened injury must be certainly

impending to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient.").

In an initial cursory argument, plaintiff contends that *Clapper* does not apply because defendants' Guidance is currently harming its members by providing "an experimental and controversial form of psychological/psychosocial medical treatment" without parental notice or consent.  Dkt. 15 at 7.  However, the complaint does not include allegations supporting an inference that any actual harm is occurring now.  Thus, the crux of the parties' dispute is whether the *possible* application of the policy to plaintiff's members and their children is sufficiently imminent and harmful to confer standing.  *See Parents Defending Educ. v. Linn-Mar Cmty. Sch. Dist.*, 2022 WL 4356109, at *9 (N.D. Iowa Sept. 20, 2022) ("In the absence of enforcement on a facial challenge, courts evaluate whether injury was caused through a chilling effect or through a credible threat of enforcement.").

As plaintiff points out, "*Clapper* does not . . . foreclose any use whatsoever of future injuries to support Article III standing." *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 693 (7th Cir. 2015).  The Court has explained that

> Our cases do not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about. In some instances, we have found standing based on a "substantial risk" that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm.

> *Clapper*, 568 U.S. at 414 n.5 (internal citations omitted).

*See also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur."); *TransUnion LLC v. Ramirez*, ___ U.S. ___, 141 S. Ct. 2190, 2210 (2021) ("[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial.").

Nonetheless, "[i]n *Clapper*, the Court decided that human rights organizations did not have standing to challenge the Foreign Intelligence Surveillance Act (FISA) because they could not show that their communications with suspected terrorists were intercepted by the government" but instead relied only on their suspicions that "such interceptions might have occurred." *Remijas*, 794 F.3d at 693. The Court went on to note that "to the extent that the 'substantial risk' standard is relevant and is distinct from the 'clearly impending' requirement, respondents fall short of even that standard, in light of the attenuated chain of inferences necessary to find harm here. . . Plaintiffs cannot rely on speculation about 'the unfettered choices made by independent actors not before the court.'" *Clapper*, 568 U.S. at 414 n.5.

Plaintiff argues that the potential harm in this case is not as attenuated as that in *Clapper*. Instead, plaintiff contends that this case is more analogous to *Remijas*, 794 F.3d at 690 and 693, in which all plaintiffs had their identity stolen through a hack that targeted defendant but only some plaintiffs suffered fraudulent charges. The court in *Remijas* held that plaintiffs had shown a substantial risk of harm from the data breach because it was plausible to infer that the purpose of the hack was to make fraudulent charges or to assume stolen identities with respect to all of the affected plaintiffs. *Id.* at 693. The court of appeals explained that "[u]nlike in *Clapper*, where respondents' claim that they would suffer future harm rested on a chain of events that was both 'highly attenuated' and 'highly speculative,' the risk that Plaintiffs' personal data will be misused by the hackers who breached Adobe's network is immediate and very real." *Id.* (quoting *In re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1214 (N.D. Cal. 2014) (involving similar data breach case)).

I am not persuaded by plaintiff's argument.

Plaintiff's entire standing argument is premised on a speculative chain of possibilities, including future choices made by individuals who have not yet been identified, indeed who *cannot* yet be identified because they have *not* acted, and they might *never* act. This will not

suffice.  "[T]he failure to raise a right to relief above the speculative level is the very definition of insufficient pleading." *Phillips v. Board*, 2017 WL 3503273 (N.D. Ind. 2017) at *3 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Plaintiff's asserted injuries are based on its belief that the Guidance one day will interfere with one of its members' right to direct the upbringing of their child.  Therefore, to sustain an injury, a member's child must:  (1) develop a belief that they have a gender identity that differs from their biological sex; (2) affirmatively approach a district employee and request gender identity support; (3) request a gender support plan; and (4) make the request without parental consent or knowledge.  Also part of this chain of possibilities are:  (5) the school must not discuss the gender support plan with the parent and/or (6) the parent must not request to see the student's educational records.

As the Northern District of Iowa recently held in denying a motion for a preliminary injunction seeking to prevent enforcement of a similar gender identity support policy and plan:

> Though the Court does not doubt their genuine fears, the facts currently alleged before the Court do not sufficiently show the parents or their children have been injured or that they face certainly impending injury through enforcement of the Policy. The theory that (1) their child will express a desire for or indicate by mistake a desire for a plan, (2) the child will be given a plan, (3) without parental consent or knowledge, (4) and the information will be hidden or denied when parents ask requires too many speculative assumptions without sufficient factual allegations to support a finding of injury.

> *Parents Defending Educ.*, 2022 WL 4356109, at *9.

Reliance on such speculative, discretionary acts of others precludes a finding of standing.  *Id.*; *see also The Cornucopia Inst. v. United States Dep't of Agric.*, 260 F. Supp. 3d 1061, 1069 (W.D. Wis. 2017) ("Like *Clapper*, plaintiffs' chain of causation here is further weakened by its reliance on third parties' discretionary acts.").

Nonetheless, plaintiff insists that because of the Guidance:  (1) its members will be denied critical information necessary for its members to exercise their constitutional rights; (2)

its members must surrender their constitutional right to receive public education for their children; and (3) its members will be denied their right under the PPRA to obtain information and opt out of specified public school activities.  Although plaintiff cites a number of additional cases and standing-related doctrines in an attempt to show a possible injury, I am not persuaded its arguments or cited authority for the reasons stated below.

### A.  Threatened Loss of and Interference With Constitutional Right

Plaintiff argues that courts have recognized that a threatened violation of constitutional rights amounts to irreparable harm and should be actionable.  *See Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021) (Regarding challenge to Small Business Administration's use of racial preferences in awarding funding, court held "when constitutional rights are threatened or impaired, irreparable injury is presumed."); *Democratic Nat'l Comm. v. Bostelmann*, 451 F. Supp. 3d 952, 969 (W.D. Wis. 2020) (State-imposed voting restrictions are "threatened loss of constitutional rights [that] constitute[] irreparable harm.").  However, unlike in this case, the policies and statutes at issue in *Vitolo* and *Bostelmann* applied directly to the plaintiffs themselves and barred the exercise of *their* constitutional rights.  *See Vitolo*, 999 F.3d at 358-59 ("The injury here is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.") (internal citations omitted).  Although plaintiff argues that defendants' Guidance denies its members the information they need to exercise their constitutional decision-making authority regarding their children, the actual application of the Guidance to *their* children remains fatally speculative for the reasons discussed above.

Plaintiff cites *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007), in which the Court held that parents of children enrolled in a school district had standing to challenge a policy using race to reassign the school students would attend, even though there was no guarantee that the policy would be applied to change the school of any

particular child.  Even though plaintiff's members' children had not yet been denied their preferred school because of their race, the Court found that harm was not speculative because *every* student enrolled in the school district would be "forced to compete in a race-based system that may prejudice" them.  *Id.* at 719.  In other words, the school assignment policy created a systemic process that would affect all students as they matriculated from elementary school to middle school or middle school to high school.  Here, in contrast, plaintiff's alleged lack-of-information injury is not systemic:  the Guidance will not be applied to all children, or even most children.  Only a small fraction of ECASD students ever will make use of the policy, and a fraction of that group *will* alert their parents.  Whether any of plaintiff's members' children will seek assistance under the Guidance without their parents' knowledge or input is completely conjectural.

Plaintiff also cites *Jackson v. City and County of San Francisco*, 746 F.3d 953 (9th Cir. 2014), (which involved the constitutionality of a city ordinance banning the sale of hollow-point ammunition) for the proposition that a violation of a constitutional right occurs when government action makes the exercise of a constitutional right nearly impossible.[2]  Plaintiff notes that the Ninth Circuit recognized that the "Second Amendment . . . does not explicitly protect ammunition" but held that "[n]evertheless, without bullets, the right to bear arms would be meaningless" and "[t]hus the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them."  *Id.* at 967.  However, the court of appeals made this finding in the context of determining whether a constitutional claim had been stated, not whether the plaintiff had standing.  In addressing standing, the *Jackson* court applied the injury-in-fact test outlined in *Lujan*: plaintiff must show injury in fact that is concrete and particularized and actual or imminent and not conjectural or hypothetical.  *Id.*  The court of

---

[2] As discussed at-length above, plaintiff mischaracterizes the Guidance as actively hiding a constitutional violation from parents.

appeals found that plaintiff Jackson satisfied that standard because she was a gun owner who would purchase hollow-point ammunition within San Francisco but-for the challenged ordinance.  *Id.*  Therefore, *Jackson* is not on point and does not support plaintiff's contention that it has standing in this case based on a denial of information.[3]

## B.  Pre-Enforcement Challenge

Plaintiff also asserts that it has standing to bring a pre-enforcement challenge to the district's Guidance under Supreme Court precedent allowing "pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent." *Susan B. Anthony List*, 573 U.S. at 159; *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007) ("[W]here threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat").  Under this precedent, "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List*, 573 U.S. at 159 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)); *see also Brown v. Kemp*, 506 F. Supp. 3d 649, 656 (W.D. Wis. 2020) (citing same).

---

[3] After briefing was completed, plaintiff filed a notice of supplemental authority, dkt. 19, in which it cites *Deanda v. Becerra*, 2022 WL 17572093 (N.D. Tex. Dec. 8, 2022), without discussion, as support for its standing argument.  Defendants did not have the opportunity to address this case, but their input is not necessary because *Deanda* does not does change this court's conclusion.  *Deanda* addresses a father's challenge to Title X of the Public Health Service Act, 42 U.S.C. §§ 300, which "mak[es] comprehensive voluntary family planning services readily available to all persons desiring such services." *Id*. at 1. The federal statute expressly instructed grant recipients that they could not require parental consent for their child's access to contraception (although they should "encourage family participation") and it did not allow parents to opt out of family planning services for their children.  *Id.* at 3-6.  But Texas law confers upon parents the right to consent to their children's medical treatment, along with general standing to file suit for a violation of that right.  *Id.* at 6.  The court in *Deanda* found that the father's loss of his state-law right to consent to the medical treatment of his minor children constituted an injury in fact, even though an actual medical situation had not yet arisen.  *Id.* at 3 and n.1.

Although the "plaintiff's fear of prosecution and self-censorship constitute the injury for standing purposes" in such cases, "the mere existence of a statute [or in this case, a policy] adverse to plaintiff's interests is not sufficient to show justiciability." *Deida v. City of Milwaukee*, 192 F. Supp. 2d 899, 905-06 (E.D. Wis. 2002). The Supreme Court has made clear that "persons having no concrete fears that a policy or statute will be applied against them, except for those fears that are imaginary or speculative, are not accepted as appropriate plaintiffs." *Babbitt*, 442 U.S. at 298 (quoting *Younger v. Harris*, 401 U.S. 37, 42 (1971) and *Golden v. Zwickler*, 394 U.S. 103 (1969)). As discussed above, plaintiff has not shown that its members are under any real or credible threat of being subjected to the Guidance. *See Anders v. Fort Wayne Cmty. Sch.*, 124 F. Supp. 2d 618, 628-30 (N.D. Ind. 2000) (citing *Babbitt* and Seventh Circuit cases for same in case involving policy to search vehicles on school property). Although plaintiff argues that parents *may* choose to withdraw their children from school or abandon their rights to public education in order to avoid the policy, that scenario also is speculative and is not based on any realistic or impending action by district staff.

### C.  Unconstitutional Conditions Doctrine

As plaintiff notes, the unconstitutional conditions doctrine prevents the government from awarding or withholding a public benefit for the purpose of coercing the beneficiary to give up a constitutional right or to penalize his or her exercise of a constitutional right. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972) ("For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited."); *Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't Health*, 699 F.3d 962, 986 (7th Cir. 2012) ("Understood at its most basic level, the doctrine aims to prevent the government from achieving indirectly what the Constitution prevents it from achieving directly."); *see also Carson v. Makin*, 142 S. Ct. 1987

17

(2022) (tuition assistance program penalized free exercise of religion by disqualifying private religious schools from generally available benefit for families whose school district did not provide public secondary school).

However, the doctrine does not "give rise to a constitutional claim in its own right; the condition must actually cause a violation of a substantive [constitutional] right." *EklecCo NewCo LLC v. Town of Clarkstown*, 2019 WL 2210798, at *12 (S.D.N.Y. May 21, 2019) (quoting *U.S. v. Oliveras*, 905 F.2d 623, 628 n.8 (2d Cir. 1990), and citing *Dolan v. City of Tigard*, 512 U.S. 374, 407 n.12 (1994) (noting unconstitutional conditions doctrine "has never been an overarching principle of constitutional law that operates with equal force regardless of the nature of the rights and powers in question")).

Plaintiff invokes the unconditional conditions doctrine in making a cursory argument that defendants' Guidance conditions the right to attend public school on parents surrendering their constitutionally protected right to the care, custody, and control of their children. However, the argument does not provide plaintiff with a path to standing. Plaintiff's citations to *Perry* and *Carson* are not helpful because neither case discusses the unconditional conditions doctrine in terms of standing or addresses the speculative nature of plaintiffs' alleged injuries. In *Perry*, the Supreme Court merely reaffirmed that the government cannot deny someone a government benefit because that person exercised a constitutionally protected right, such as free speech. 408 U.S. at 597. And in *Carson*, the Court emphasized the general rule that the state violates the free exercise clause when it excludes religious observers from otherwise available public benefits. 142 S. Ct. at 1996. In the instant case, none of plaintiff's members have been subject to retaliation or excluded from anything for their opposition to the Guidance. In addition, and as explained above, plaintiff's allegation that the Guidance hinders its members' rights to send their children to public school is too speculative to confer standing.

18

### D.  PPRA and Informational Standing

Plaintiff contends that defendants have violated its rights related to student surveys and evaluations under the PPRA, 20 U.S.C. § 1232h, and its implementing regulations, 34 C.F.R. § 98.4(a).  Specifically, plaintiff cites §§ 1232h(b)(2), (3), and (5), which provide that "[n]o student shall be required, as part of any applicable program, to submit to a survey, analysis, or evaluation that reveals information concerning . . . mental or psychological problems of the student or the student's family, sex behavior or attitudes, or critical appraisals of other individuals with whom respondents have close family relationships" without "the prior written consent of the parent."  In addition, plaintiff points to 34 C.F.R. §§ 98.4(a)-(b), which provide in relevant part that no student shall be required to submit without prior parental consent to a psychiatric or psychological examination, testing, or treatment in which the primary purpose is to reveal information concerning sex behaviors and attitudes and other sensitive issues.  The regulations define a "psychiatric or psychological examination or test" as a method of obtaining information "that is not directly related to academic instruction and that is designed to elicit information about attitudes, habits, traits, opinions, beliefs or feelings." § 98.4(c)(1).  According to plaintiff, the above provisions "describe[] exactly what occurs when the District requires students to complete a gender support plan with school staff."  Dkt. 15 at 21.

Although the parties debate whether there is a private right of action under PPRA that can be brought under § 1983, it is unnecessary to reach those arguments because plaintiff has failed to show that it has suffered, or is at a substantial risk of suffering, an injury in fact that would permit it to pursue any such claims.  Plaintiff argues that it has informational standing because its members are injured by the district's "promise that it will deny them information about their children that the PPRA requires the District to disclose."  Dkt. 15 at 21.  However, as explained above, this argument is based on a mischaracterization of the Guidance and Plan documents.  Neither document requires students to complete a gender support plan without

their parents' consent, and neither document states that information will be withheld from parents. Moreover, plaintiff has not alleged that defendants have required any child to submit to any type of survey, analysis, or evaluation in conjunction with the gender identity support Guidance. Accordingly, plaintiff has failed to show standing on this ground as well.

## CONCLUSION

Defendants frame this lawsuit as arising out of "plaintiff's members uncomfortableness with transgender individuals, and their speculative fears about what would happen if their child became gender non-conforming." Def. Reply, dkt. 18, at 2. Plaintiff rejects this characterization, framing its lawsuit as a defense of the parental, religious, and statutory rights of its members to raise their children as they see fit. Pl.'s Resp., dkt. 15, at 51. It's a fraught topic, and both sides are entitled to their views on the issues that underlie ECASD's Gender Identity Policy. At this juncture, however, the issue before this court is narrow and procedural: does plaintiff have standing to bring the instant lawsuit? For the reasons stated above, I have concluded that it does not.

## ORDER

IT IS ORDERED that defendants' motion to dismiss, dkt. 11, is GRANTED, and the motion for leave to file an amicus curiae brief, dkt. 10, is DENIED as unnecessary. The case is DISMISSED without prejudice for lack of subject matter jurisdiction.

Entered this 21st day of February, 2023.

BY THE COURT:

/s/
_____

STEPHEN L. CROCKER
Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

PARENTS PROTECTING OUR
CHILDREN, UA,

     Plaintiff,                                 Case No.  22-cv-508-slc

    v.

EAU CLAIRE AREA SCHOOL
DISTRICT, WISCONSIN; TIM
NORDIN; LORI BICA; MARQUELL
JOHNSON; PHIL LYONS; JOSHUA
CLEMENTS; STEPAHNIE FARRAR;
ERICA ZERR; and MICHAEL
JOHNSON,

     Defendants.

---

## JUDGMENT IN A CIVIL CASE

---

IT IS ORDERED AND ADJUDGED that judgment is entered in favor of defendants Eau Claire Area School District, Wisconsin, Tim Nordin, Lori Bica, Marquell Johnson, Phil Lyons, Joshua Clements, Stephanie Farrar, Erica Zerr, and Michael Johnson against plaintiff Parents Protecting Our Children, UA dismissing this case without prejudice for lack of subject matter jurisdiction.

| | |
|---|---|
| s/ Deputy Clerk | 2/22/2023 |
| Joel Turner, Clerk of Court | Date |